# In the United States Court of Federal Claims

L3HARRIS TECHNOLOGIES, INC.,

*Plaintiff,*

v.

THE UNITED STATES,

*Defendant,*

and

BALL AEROSPACE & TECHNOLOGIES CORPORATION,

*Defendant-Intervenor.*

No. 24-129C
(Filed: April 25, 2024)[1]

*Andrew E. Shipley*, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, for Plaintiff.

*Stephen C. Tosini*, Civil Division, United States Department of Justice, Washington, DC, for Defendant.

*Luke P. Levasseur*, Mayer Brown LLP, Washington, DC, for Defendant-Intervenor.

**OPINION AND ORDER**

**LERNER**, *Judge.*

    L3Harris Technologies, Inc. ("L3Harris") protests the National Aeronautics and Space Administration ("NASA") Goddard Space Flight Center's ("GSFC" or the "Agency") contract award to Ball Aerospace and Technologies Corporation ("Ball"). Compl., ECF No. 1. The contract was the last of three closely related contracts under the Geostationary Extended Observation ("GeoXO") Sounder weather satellite program.[2] *Id.* According to L3Harris, the

---

[1]    This Opinion was filed on April 16, 2024, and the parties were afforded fourteen days to propose appropriate redactions. On April 25, 2024, they did so, ECF No. 73, and the Court accepted them, ECF No. 74. Accordingly, the Court reissues this Opinion incorporating the proposed redactions which are noted with bracketed asterisks, i.e., [***].

[2]    "The GeoXO Sounder (GXS) will provide real-time information about the vertical distribution of atmospheric moisture, winds, and temperature. . . . It will be used for the estimation of temperature and humidity in the atmosphere by altitude, creating a profile of the

Agency's selection process "was riddled with errors, including casting aside the [Request for Proposals'] plain language to abandon the stated evaluation criteria, failing to perform a reasonable cost-realism analysis, engaging in disparate treatment, failing to adequately document its evaluation, and creating an unmitigable appearance of impropriety . . . ." *Id.* at 1. The Agency's actions, L3Harris claims, violated applicable procurement law, were arbitrary, and an abuse of discretion. *Id.* at 1–2. L3Harris asks the Court to 1) issue declaratory judgment that Defendant's "award of the Implementation Contract to Ball is arbitrary, capricious, an abuse of discretion, and contrary to applicable federal law and regulations"; 2) enjoin "Defendant from continuing performance on the contract awarded to Ball"; and 3) order "Defendant to award the contract to L3Harris or, in the alternative, conduct a second procurement process in accordance with the RFP, the [Federal Acquisition Regulation], and other applicable laws and regulations." *Id.* at 31.

In post-award bid protests, the Court's standard of review is set out in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4). The APA directs a reviewing court to hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," as well as action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D); *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). The "arbitrary or capricious standard . . . is highly deferential" to the agency's decision and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). A protestor, such as L3Harris, "bears a heavy burden of showing that the . . . decision had no rational basis." *Impresa Construzioni*, 238 F.3d at 1333 (cleaned up). Indeed, the "ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Co-Steel Raritan, Inc. v. Int'l Trade Comm'n*, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (quoting *Tex. Crushed Stone Co. v. United States*, 35 F.3d 1535, 1540 (Fed. Cir. 1994)).

It is the Court's role to ensure the agency considered relevant factors and followed applicable procurement law. The Court must uphold an agency's decision against a challenge if the "contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (internal citations omitted). Courts will sustain an agency's decision of "less than ideal clarity" as long as "the agency's path may reasonably be discerned." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009) (internal citations omitted). The "deference afforded to an agency's decision must be even greater when a trial court is asked to review a technical evaluation because of the highly specialized, detailed, and discretionary analyses frequently conducted by the government." *CSC Gov't Sols. LLC v. United States*, 129 Fed. Cl. 416, 434 (2016) (cleaned up).

In a negotiated best-value procurement, like the one at issue here, the Court's deference is even greater. *See* AR 52 (NASA documents stating selection procedures aimed at "ensuring a best value selection"); AR 3482 (L3Harris stating its proposal provides a "best-value solution");

---

atmosphere. The instrument will also provide estimates of the wind fields." NOAA, *GeoXO Sounder* (GXS), https://www.nesdis.noaa.gov/our-satellites/future-programs/geoxo/geoxo-sounder-gxs [https://perma.cc/7HV4-AXAT].

AR 303 ("This competitive negotiated acquisition . . . "); *see also Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("Because the bid protest at issue here involved a 'negotiated procurement,' the protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater than in other types of bid protests."); *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government.").

Before this Court are the parties' cross-motions for Judgment on the Administrative Record.  Pl.'s Mot. for J. on the Admin. R. ("Pl.'s Mot."), ECF No. 54; Def.'s Resp. and Cross-Mot. for J. on the Admin. R. ("Def.'s Mot."), ECF No. 61; Intervenor's Resp. and Cross-Mot. for J. on the Admin R. ("Intervenor's Mot."), ECF No. 62.  For the reasons below, Plaintiff's Motion is **DENIED**.  Defendant's and Defendant-Intervenor's Cross-Motions are **GRANTED**.

## I.   Factual Background

### A.   Invitation for Bids and Contract Award

GeoXO is a collaborative mission between the National Oceanic and Atmospheric Administration ("NOAA") and NASA for the "development, launch, and operation of the next generation of weather satellites."  Def.'s Mot. at 2.  The Geostationary Extended Observations Sounder Instrument ("GXS") is a "hyperspectral infrared instrument, a camera-like device that has many 'channels' to detect wavelengths of infrared light" and is one of five instruments set to fly in the GeoXO Program.  *Id.*; *NASA Selects Ball Aerospace to Develop NOAA's GeoXO Sounder Instrument*, NASA, https://www.nasa.gov/news-release/nasa-selects-ball-aerospace-to-develop-noaas-geoxo-sounder-instrument/ [https://perma.cc/6BM4-SNLH].  The GXS will provide sounding observations for NOAA and NASA on "atmospheric temperature and water vapor for weather prediction models."  AR 5667, 6073.  The GeoXO's program goal is to dramatically improve weather forecasting capabilities for users of NOAA information.  AR 5667–78.

On February 10, 2023, NASA issued a RFP to provide a Sounder Instrument for the GeoXO program.  AR 179.  The contract was for the development of one Flight Model ("FM"), with options to build FM-2 and FM-3, and "four options for additional value to perform Engineering Studies."  *Id.*  The performance period runs until October 2050 based on an FM-1 launch date of October 2035.  AR 5614.  The contract scope included "the tasks and deliverables necessary to design, analyze, develop, fabricate, integrate, calibrate, test, verify, evaluate, support launch, supply and maintain the instrument Ground Support Equipment . . . and support Mission Operations at the NOAA Satellite Operations Facility."  AR 179.

NASA instructed contractors to submit proposals consisting of four volumes: (I) an Offer Volume; (II) a Mission Suitability Volume; (III) a Cost Volume; and (IV) a Past Performance Volume.  AR 272–73.

| Volume | Title |
|---|---|
| I | Offer Volume (including Standard Form (SF) 33 and Sections B-J of Model Contract including Representations and Certifications) |
| II | Mission Suitability Volume |
| III | Cost Volume |

| IV | Past Performance Volume |
|---|---|

The proposals would be evaluated against three evaluation factors: Mission Suitability, Cost, and Past Performance. AR 6228. Under the RFP evaluation criteria, Mission Suitability was more important than Cost, and Cost was more important than Past Performance. AR 304. Within the Mission Suitability evaluation factor, the RFP required offerors to address three subfactors: (A) Technical Approach; (B) Management Approach; and (C) Small Business Utilization. AR 280–81. NASA would conduct a best-value procurement under FAR Part 15 procedures, evaluating and balancing each of the three factors. AR 303; Intervenor's Mot. at 4. Of the three evaluation subfactors, only Mission Suitability would be numerically scored, but each factor helped determine which proposal prevailed. AR 6228.

| Mission Suitability | | Points |
|---|---|---|
| Subfactor A | Technical Approach | 750 |
| Subfactor B | Management Approach | 150 |
| Subfactor C | Small Business Utilization | 100 |
| **Total** | | **1,000** |

The Mission Suitability subfactors—(A) Technical Approach; (B) Management Approach; and (C) Small Business Utilization—were numerically weighted and scored in accordance with the RFP's 1,000-point scale. AR 308. Technical Approach weighed the most and was worth 750 points. *Id.* Management Approach was valued at 150 points, and Small Business Utilization weighed the least and was worth 100 points. *Id.* These subfactors were scored using an adjectival rating from "Excellent" to "Poor," and given a numerical equivalent set forth in NASA FAR Supplement ("NFS") 1815.305(a)(3)(A). AR 6233. For instance, if an offeror's Technical Approach was assigned one strength and one weakness, the proposal would be assigned an adjectival rating of "Good." *See, e.g.*, Intervenor's Mot. at 5. The proposal then received between 51 and 70 percent of the maximum score. *See, e.g.*, Def.'s Mot. at 7–8. Thus, because the Technical Approach had a maximum score of 750 points, AR 308, a proposal receiving a "Good" adjectival rating could be assigned between 382 (i.e., 51 percent of 750) and 525 (i.e., 70 percent of 750) points.

The proposed costs were assessed to determine their reasonableness and cost realism in accordance with FAR 15.305(a)(1) and NFS 1815.305(a)(1)(B). AR 309; Intervenor's Mot. at 5. The bidding period opened on February 10, 2023, and closed on March 17, 2023. AR 179–81. Only two companies submitted bids: L3Harris and Ball. AR 10; AR 5668.

Proposals were evaluated by a Source Evaluation Board ("SEB"). AR 5667. "The SEB included a team of technical and business members and consultants from appropriate disciplines to assist in proposal evaluations." AR 5668. For the Mission Suitability factor, out of a possible 1,000 points, SEB assigned Ball 710 total points and L3Harris received 748 points, consistent with the adjectival-to-point assignment system described above. AR 5527. As for the cost evaluation, the SEB made upward adjustments to both proposals. AR 5560; Intervenor's Mot. at 5. Overall, Ball's Total Proposed Price was $486,863,958, with a Total Probable Price (after evaluator adjustment) of $553,897,346. AR 5560. L3Harris' Total Proposed Price was $764,912,447 with a Total Probable Price of $790,953,918. *Id.*

| Offeror | Proposed Labor Hours | Proposed Costs | Proposed Award Fee | Total Proposed Price | Probable Cost Adjustment | Total Probable Cost |
|---------|---------------------|----------------|--------------------|---------------------|--------------------------|---------------------|
| Ball | [***] | [***] | [***] | $486,863,958 | $67,033,388 | $553,897,346 |
| L3Harris | [***] | [***] | [***] | $764,912,447 | $26,041,471 | $790,953,918 |

*Id.*

The SEB presented its findings to the Source Selection Authority ("SSA") who reviewed the Board's evaluation of the two proposals and selected an awardee. AR 5667; 5672–73 ("I carefully reviewed the SEB's documentation . . . and discussed with the SEB its rationale for the findings . . . "). The SSA agreed with the SEB that Ball's contract met the stated RFP requirements. AR 5673–76. The SSA found "a slight discriminator for the Technical Approach subfactor" which was based on L3Harris' strength in a justifiable design and found its "proposal was slightly stronger." AR 5673–75. The SSA found no discriminators for Subfactors B (Management Approach) or C (Small Business Utilization Plan). *See* AR 5675 ("After reviewing each offeror's findings in Subfactor B, I found no discriminators between the Offeror's management approaches, which I found to be similarly beneficial."); *id.* ("After reviewing all findings, I concluded both offerors had good small business subcontracting approaches that demonstrated a commitment to small business resulting in no discriminator between the proposals."); Intervenor's Mot. at 6–7.

For the Cost Factor, the SSA accounted for the significantly lower probable cost Ball proposed compared to L3Harris. AR 5675. This discrepancy resulted in a "very significant cost advantage for Ball." *Id.* Ball received a significant cost difference because it proposed a "simpler architecture approach" and a "lower fee percentage." *Id.* Based on the "thorough explanation" from the SEB, the SSA "accepted the cost differences as reasonable and realistic." *Id.* Accordingly, the SSA, in balancing all three relevant factors (Mission Suitability, Cost, and Past Performance), determined L3Harris' slight advantage in Mission Suitability was offset by Ball's "significantly lower probable cost." *Id.* The SSA "recognized that Mission Suitability is the most important factor," and "concluded that Ball's very significant cost advantage more than off-sets L3Harris' slight Mission Suitability advantage." AR 5676. As a result, the SSA "concluded that Ball's proposal offer[ed] the best value to the Government" and selected Ball "for award of the GXS contract." *Id.* On September 11, 2023, NASA notified the offerors of its decision to award the contract to Ball. AR 6076. L3Harris requested a debrief, which was held on September 20, 2023. *Id.*

B. Procedural History

On September 25, 2023, L3Harris filed a protest with the Government Accountability Office ("GAO"). AR 5911; *see L3Harris Tech., Inc.*, B-422006, 2023 CPD ¶ 290 (Comp. Gen. Dec. 20, 2023). L3Harris claimed that NASA abandoned the RFP's stated evaluation framework, and thus its bid should not have been rejected. AR 10400–08. First, L3Harris supported its position by stating that the technical approach required the lowest risk, high maturity design solution that met the totality of the technical requirements. *Id.* Also, L3Harris argued NASA's cost realism analysis was incorrect because it rested on "arbitrary assumptions as to the level of effort needed to transform Ball's immature, high risk, technical solution into one that actually works" and because it failed to assess the impact of Ball's recent acquisition. AR 10420. Third, Plaintiff argued NASA engaged in disparate treatment by adjusting its

proposed costs for L3Harris but failing to do so for Ball's proposed costs. AR 10461–63. Finally, L3Harris alleged an organizational conflict of interest because NASA hired a former Ball employee, [***]. AR 10447–54.

GAO denied the protest on December 20, 2023. AR 10536. GAO rejected L3Harris' argument that NASA abandoned the RFP evaluation requirements because the language is clear that the technical approach "would be one of many considerations." AR 10541. GAO also found no basis for L3Harris' assertion that the SEB should have assigned a different rating for Ball's proposal because the SEB properly identified and substantiated their evaluations. AR 10543. GAO noted that L3Harris withdrew its allegations of disparate treatment, and denied L3Harris' argument that NASA's cost realism analysis was incorrect. AR 10539, 10546. It determined the SEB adequately documented its evaluations. *Id.* NASA "fully appreciated that L3Harris proposed more labor hours" and there was "no merit to the protestor's allegation that the agency failed to understand that L3Harris proposed more labor hours." *Id.* Finally, L3Harris' argument about a conflict of interest failed because GAO found the "facts do not reasonably suggest that the SSA could not make an impartial selection simply because one of the competitors formerly employed [***]." AR 10551. GAO determined that the record showed neither the SSA "nor [***] would benefit financially or otherwise from Ball's selection for award." *Id.*

L3Harris filed its Complaint in this court on January 26, 2024. Compl. Plaintiff moved on the same day for a Temporary Restraining Order and Preliminary Injunction to prevent NASA from allowing Ball to continue any performance on the GeoXO Contract. Pl.'s Mot. for Temp. Restraining Order at 1, ECF No. 3. On January 29, 2024, Ball filed an unopposed Motion to Intervene. Def.'s Mot. to Intervene, ECF No. 16. After the initial status conference, L3Harris withdrew its TRO Motion. *See* ECF No. 55.

L3Harris filed two motions to Complete the Administrative Record, both of which it withdrew after the Government confirmed that the requested documents either did not exist or were not considered by the Agency. *See* Pl.'s Mot. to Complete the Admin. R., ECF No. 37; ECF No. 39 (Government's confirmation); Pl.'s Second Mot. to Complete the Admin. R., ECF No. 44; ECF No. 55 (withdrawing motions); ECF No. 64 (status conference transcript). On March 4, 2024, Plaintiff moved for judgment on the administrative record. Pl.'s Mot. The Government and Defendant-Intervenor's cross-motions and responses followed on March 18. Def.'s Mot; Intervenor's Mot. Plaintiff replied on March 27. Pl.'s Reply. The Government and Defendant-Intervenor replied on April 5. Def.'s Reply, ECF No. 66; Intervenor's Reply, ECF No. 67.

## II.    Jurisdiction

The Court of Federal Claims has jurisdiction over protests by "an interested party objecting to a solicitation by a federal agency for bids or proposals for a proposed contract . . . or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). Because L3Harris bid on the Implementation Contract at issue and claims it would have received the award if the Agency had not improperly selected Ball, this Court has jurisdiction to adjudicate Plaintiff's claims.

### III.    Standard of Review

At issue is whether the Agency's decision was arbitrary, capricious, an abuse of discretion, or contrary to law. *Celerapro, LLC v. United States*, 168 Fed. Cl. 408, 424–25 (2023).  "[T]he Court reviews the agency's procurement decision to determine whether it is supported by the administrative record." *PAE Applied Techs., LLC v. United States*, 154 Fed. Cl. 490, 504 (2021).  "[A] reviewing court may set aside a procurement action if (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (internal quotation marks omitted).  "Ultimately, if the Court finds an agency is within its bounds, it is not for the Court to substitute its own judgment for that of the agency." *CeleraPro, LLC v. United States*, 168 Fed. Cl. 408, 425 (2023) (citing *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1371 (Fed. Cir. 2009)).

In reviewing procurement decisions, the Court applies a "presumption of regularity" and should not substitute its judgment for that of the agency. *Logistics Co., Inc. v. United States*, 163 Fed. Cl. 542, 553 (2022).  Contracting officers are "entitled to exercise discretion upon a broad range of issues." *Impresa*, 238 F.3d at 1332 (citation omitted).  "For that reason, procurement decisions invoke highly deferential rational basis review." *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (cleaned up).  "The rational basis test asks, 'whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018) (quoting *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004)).

Bid protests are generally decided on motions for judgment on the administrative record under Rule 52.1 of the Rules of the United States Court of Federal Claims.  *See, e.g.*, *Trace Sys. Inc. v. United States*, 165 Fed. Cl. 44, 56 (2023).  When deciding these motions, the Court must "make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354 (Fed. Cir. 2005); *Sierra Nevada Corp. v. United States*, 107 Fed. Cl. 735, 751 (2012) ("Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record.").  The Court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A&D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006).

An agency decision is arbitrary and capricious when it results from unequal treatment of the offerors.  *See CliniComp Int'l Inc. v. United States*, 117 Fed. Cl. 722, 742 (2014) ("unequal treatment is fundamentally arbitrary and capricious, and violates . . . full and open competition").  An offeror is treated unequally when "the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020).  If a protestor demonstrates the relevant proposals were substantively indistinguishable, a reviewing court may compare and analyze "the agency's treatment of proposals without interfering with the agency's broad discretion in these matters." *Id.* at 1373.

An agency decision is also arbitrary and capricious if the decision stems from the agency's application of unstated evaluation criteria. *See NVE, Inc. v. United States*, 121 Fed. Cl. 169, 180 (2015).  "An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation." *Golden IT, LLC v.*

*United States*, 165 Fed. Cl. 676, 686 (2023) (citing FAR 15.305(a)).  To demonstrate an agency applied unstated evaluation criteria, "a protester must show that . . . the procuring agency used a significantly different basis in evaluating the proposals than was disclosed."  *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 387 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

"[C]ontracting agencies enjoy wide latitude in conducting the cost realism analysis." *Agile Def., Inc. v. United States*, 959 F.3d 1379, 1385–86 (Fed. Cir. 2020); *see, e.g.*, *Mission1st Grp., Inc. v. United States*, 144 Fed. Cl. 200, 211 (2019) ("It is well established that contracting agencies have broad discretion regarding the nature and extent of a cost realism analysis, unless the agency commits itself to a particular methodology in a solicitation." (citation and internal quotation marks omitted)); *United Payors & United Providers Health Servs., Inc. v. United States*, 55 Fed. Cl. 323, 329 (2003) (emphasizing that the procuring "agency is in the best position to make [the] cost realism determination" (citation and internal quotation marks omitted)).  Thus, the Court's review of cost realism determinations is "highly deferential," and its scope is "very narrow."  *McConnell Jones Lanier & Murphy LLP v. United States*, 128 Fed. Cl. 218, 236 (2016).

The Court also review claims of inadequate documentation under the APA's arbitrary and capricious standard.  *G4S Secure Sols. (USA), Inc. v. United States*, 146 Fed. Cl. 265, 269 (2019).  An agency's decision does not violate the APA if the agency "provided a coherent and reasonable explanation of its exercise of discretion."  *Id.*  This standard applies even if the clarity of the agency's decision is "less than ideal," so long as "the agency's path may reasonably be discerned."  *Fox Television Stations, Inc.*, 556 U.S. at 513–14.

If a contracting officer's findings are rational, a decision on an alleged conflict of interest is afforded high deference.  *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1383 (Fed. Cir. 2011).  And a conflict-of-interest determination will be upheld unless it is "arbitrary, capricious, or otherwise contrary to law."  *PAI Corp. v. United States*, 614 F.3d 1347, 1352 (Fed. Cir. 2010).  An appearance of impropriety must be based on "hard facts" and not "suspicion or innuendo." *C.A.C.I., Inc.-Fed. v. United States*, 719 F.2d 1567, 1581–82 (Fed. Cir. 1983).

## IV.   Discussion

L3Harris's six-count Complaint alleges the agency made the following errors: First, (A) the Agency failed to evaluate Ball's Mission Suitability proposal in accordance with the RFP's stated evaluation criteria.  Pl.'s Mot. at 8–18.  Second, (B) the Agency failed to conduct a rational cost realism analysis.  *Id.* at 18–29.  Third, (C) the Agency engaged in unequal treatment.  *Id.* at 29–30.  Fourth, (D) the Agency's evaluation was inadequately documented.  *Id.* at 30–31.  Fifth, (E) the Agency created an unmitigated appearance of impropriety.  *Id.* at 31–35.  And lastly (F), L3Harris argues it is entitled to injunctive relief.  *Id.* at 35–39.  For the reasons below, the record does not support L3Harris' claims.

### A.  Count I: The Agency Evaluated Ball's Mission Suitability Proposal in Accordance with the RFP's Stated Evaluation Criteria.

L3Harris argues the Agency evaluated Ball's Mission Suitability factor inconsistently with the RFP's evaluation criteria.  *Id.* at 8–18.  L3Harris bases its argument on two general points.  First, it claims the Agency purportedly committed three prejudicial errors in evaluating Ball's Technical Approach (Subfactor A), which Plaintiff claims was the most important Mission Suitability subfactor.  *Id.* at 9.  These three alleged errors are: a) that the "Agency disregarded the

RFP requirement for Overall Technical Approach (Subfactor A.1)"; b) that the "Agency swept multiple flaws in Ball's Technical Approach (Subfactor A) into a single 'schedule' weakness under the much lower weighted Management Approach (Subfactor B)"; and c) that the "Agency failed to assign Ball deficiencies under the Technical Approach subfactor despite Ball's failure to substantiate compliance with government requirements." *Id.* at 9–14. L3Harris' second general point is that the Agency misevaluated Ball's Management Approach under the Mission Suitability Subfactor B. *Id.* at 16. L3Harris maintains that the Agency's improper evaluation of Ball's Mission Suitability factor was arbitrary, an abuse of discretion, and violated applicable procurement law. *Id.* at 13, 16, 18.

The Court is not convinced. To begin, "contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." *Impresa*, 238 F.3d at 1332 (cleaned up). Indeed, contracting officers "are given broad discretion in their evaluation of bids, and when an [officer's] decision is reasonable a court may not substitute its judgment for that of the agency." *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (internal citations omitted). With this guidance on deference at the forefront, the Court addresses Plaintiff's arguments in turn.

1. The Agency did not make three prejudicial errors in evaluating Ball's Technical Approach (Subfactor A).

a. *L3Harris fails to establish that the Agency disregarded a purported requirement for the "lowest risk, high maturity" design solution.*

Proposals were evaluated according to three factors: Mission Suitability, Cost, and Past Performance. AR 304. The Mission Suitability factor was divided into three subfactors: Subfactor A "Technical Approach"; Subfactor B "Management Approach"; and Subfactor C "Small Business Utilization." AR 281. Subfactor A, "Technical Approach," was further subdivided into seven subfactors: A1 "Overall Technical Approach"; A2 "Systems Engineering"; A3 "System Performance"; A4 "Instrument Design"; A5 "Manufacturing, Integration and Test"; A6 "Spacecraft I&T and Mission Operations Support"; and A7 "Risk." *Id.* L3Harris' fundamental argument is that the RFP mandated an "overall technical approach." Pl.'s Mot. at 9–12. But the technical approach subfactor does not contain an overarching requirement for the "lowest risk, high maturity" design solution. *See* Pl.'s Mot. at 9; Def.'s Mot. at 15; Intervenor's Mot. at 10–11. The chart below provides a breakdown of the seven subfactors within Subfactor A – Technical Approach and eight subfactors within Subfactor B – Management Approach.

| Mission Suitability Volume Requirement | Section Numbering |
|---|---|
| **Subfactor A - Technical Approach** | **A** |
| Overall Technical Approach | A1 |
| Systems Engineering | A2 |
| System Performance | A3 |
| Instrument Design | A4 |
| Manufacturing, Integration and Test Approach | A5 |
| Spacecraft Integration and Test and Mission Operations Support | A6 |
| Risk | A7 |
| **Subfactor B – Management Approach** | **B** |

| | |
|---|---|
| Management Approach | B1 |
| Schedule | B2 |
| Subcontracting | B3 |
| Management Structure | B4 |
| Program Manager | B5 |
| Staffing | B6 |
| Quality Assurance | B7 |
| Award Fee | B8 |
| **Subfactor C – Small Business Utilization** | **C** |

AR 281–89.

Two sections of the RFP are particularly relevant to Plaintiff's argument. Section L, "Instructions, Conditions, and Notices to Offerors," and Section M, "Evaluation Factors for Award." AR 267, 303. These two sections are not identical. For instance, under L.13.A.1—Overall Technical Approach—the instructions state that "[t]he Offeror shall describe the lowest risk, high maturity integrated GXS mission design solution that meets the totality of the technical requirements with the highest degree of heritage and lowest degree of non-recurring engineering." AR 282. Under M.3.A.1—the stated evaluation criteria for the Overall Technical Approach—the RFP explicitly states that the "Government will evaluate the Offeror's overall technical approach, including all areas and information specified in Section L.13, Paragraph A.1 for efficiency, effectiveness, clarity, reasonableness, and degree of risk." AR 304–05.

L3Harris appears to argue that Ball's Overall Technical Approach subfactor should have been evaluated according to the specific language used in the instructions. In other words, the language in the instructions should supersede the explicit evaluation criteria in the RFP. However, as noted by the Intervenor, "L3Harris conflates the RFP's instructions to offerors (contained in Section L) with the stated evaluation criteria (contained in Section M)." Intervenor's Mot. at 11. Indeed, this Court reviews the Agency's decision based on the stated evaluation criteria. *See Galen Med. Assocs.*, 369 F.3d at 1330 ("Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and *consistent with the evaluation criteria* . . . .") (emphasis added) (internal citations omitted). Put simply, the evaluation criteria did not require offerors to propose a "high heritage" solution. *Compare* Pl.'s Mot. at 10 ("RFP's requirement for a 'high heritage' solution") *with* Intervenor's Mot. at 11 ("[W]hile the RFP instructed offerors to describe the 'lowest risk, high maturity' solution, the corresponding evaluation criteria did not set forth a requirement that the Agency place any particular importance on 'high heritage.'").

More importantly, however, L3Harris improperly elevates one subfactor above the others to support its argument. It claims "the Agency treated the RFP's requirement for a 'high heritage' solution as confined solely to A.1 [Overall Technical Approach]." Pl.'s Mot. at 10. L3Harris essentially argues that had the Agency adhered to its purported "high heritage" requirement across *all* the Technical Approach subfactors, L3Harris "would have received more significant strengths or strengths because it proposed a high maturity, high heritage, low risk design, while Ball's proposal would have been decremented because its unproven, high risk, developmental design ran exactly counter to the requirement." *Id.* at 11. This argument fails because "Overall Technical Approach" is *not* an overarching element applying to the entire subfactor. Indeed, the RFP explicitly states such under the Mission Suitability requirement:

> The paragraph numbering, formatting, and sub-paragraphs within the subfactors below should not be construed as any indication of priority, weighting or as any establishment of elements or lower level criteria.  The paragraph numbering is only provided for clarity, traceability, and ease of reading between Mission Suitability Sections L and M.

AR 281.

As the Government notes, "L3Harris misreads the plain language of the RFP, trying to create an overarching requirement where there is none."  Def.'s Mot. at 16; *see also* Intervenor's Mot. at 12 ("Simply put, L3Harris' interpretation of A.1 is not supported by the plain language of the RFP."); Def.'s Reply at 2 ("L3Harris ignores the immediately preceding paragraph"); AR 6085 (contracting officer emphasizing that "[h]igh heritage is just one of seven different areas to be considered under Subfactor A.  [L3Harris] fails to consider the other six areas of the subfactor which is not consistent with the RFP").  The Court agrees.  Indeed, when L3Harris made similar arguments before GAO, it quickly dispensed with this line of reasoning as directly contradicting the plain terms of the RFP:

> Contrary to the protester's assertion, the RFP did not establish that award would be made on the basis of which offeror's overall technical approach was determined to provide "the lowest risk, high maturity integrated GXS mission design solution that meets the totality of the technical requirements with the highest degree of heritage and lowest degree of non-recurring engineering." . . . Rather, the RFP is clear that the offeror's overall technical approach would be one of many considerations under the technical approach subfactor, and otherwise stated: "A trade-off process, as described at FAR 15.101-1, will be used in making source selection."

*L3Harris Techs. Inc.*, B-422006, 2023 CPD ¶ 290 at 6 (internal citations omitted).

At bottom, L3Harris' argument may stem from misreading one of the lower-level criteria—Overall Technical Approach—as applying to the entire Technical Approach subfactor. But the RFP is unambiguous in the methodology used to evaluate proposals.  And it is clear from the record that the Agency evaluated the Overall Technical Approach factor "for efficiency, effectiveness, clarity, reasonableness, and degree of risk."  AR 304–05, 6085 (contracting officer's statement of facts describing the strengths and weaknesses of each bidder's proposals), 5674 (SSA describing its evaluation process for the two proposals and addressing L3Harris' technical advantage).  In short, there was not an *overall* technical approach mandated by the RFP.

> ### b. The Agency reasonably assigned a weakness to Ball's proposal under the Management Approach Subfactor, instead of the Technical Approach Subfactor.

L3Harris challenges the Agency's evaluation of Ball's assessment of the Technical Readiness Levels ("TRLs") for some of its proposed subsystems.  Pl.'s Mot at 12–14.  TRL "is a scale for measuring the maturity of a technology."  NASA, Technology Readiness Assessment Best Practices Guide, Tech. Rep. SP-20205003605 (2020) at 2.  "The TRL describes the state of a given technology and provides a baseline from which maturity is gauged and advancement defined."  *Id.*  TRLs, in other words, "enable the standardized assessment of the maturity of a particular technology and the consistent comparison of the maturity between different types of

technology in the context of a specific application, implementation, and operational environment." *Id.* TRLs start at TRL 1—Basic Technology Research ("Basic principles observed and reported") and progress to TRL 9—Systems Test, Launch, and Operations ("Actual system 'flight proven' through successful mission operations"). *Id.* For the Implementation Contract, offerors were required to demonstrate the TRLs of their subsystems. *See* AR 282 ("The Offeror shall describe the GXS Instrument TRL and all subsystem TRLs and substantiate the claims."); AR 305 ("The Government will evaluate the Offeror's overall systems engineering approach including all areas and information specified in Section L.13, Paragraph A.2 for scope, soundness, completeness, substantiation, and effectiveness.").

L3Harris correctly notes that the Agency found aspects of Ball's TRL Assessments "unrealistic." AR 5538; *see also* Intervenor's Mot. at 14 ("the SEB determined that Ball overestimated the TRL of many of its critical subsystems"). Plaintiff emphasizes the SEB's conclusion that "Ball *overestimated the TRL of many of its critical subsystems* including the Focal Plane Electronics, Instrument Control Electronics, the Scan Mechanism, spectrometer, and the telescope." *Id.* The Agency decremented Ball for these shortcomings, but according to L3Harris, the Agency improperly "evaluated these flaws under the much lower weighted Management Approach subfactor (worth 150 points versus Technical Approach's 750 points)." Pl.'s Mot. at 13. According to L3Harris, Ball should "have received numerous weaknesses, significant weaknesses, and/or deficiencies (and would not have received a Very Good rating) under the most important Technical Approach subfactor in addition to the weaknesses it received for schedule under Management Approach." *Id.* Instead, L3Harris maintains that TRL deficiencies should be decremented under the Technical Approach subfactor. Pl.'s Mot. at 12–14; *see also* Def.'s Mot. at 19 ("L3Harris asks the Court to re-classify SEB's finding of scheduling risk into a 'technology risk.'"); Def.'s Reply at 3 ("NASA found a 'schedule risk' and treated it as a 'schedule risk.'"); Intervenor's Reply at 6 ("L3Harris erroneously conflates additional development time with technical risk . . . .").

Again, L3Harris asks this Court to substitute its judgment for that of the Agency. The SEB acknowledged that some of Ball's TRL Assessments were "unrealistic." AR 5538; Pl.'s Mot. at 12. It also determined that while "the technology risks associated with these subsystems is low, the schedule risk is high." AR 5539. SEB reasoned that "the schedule risk is high" because Ball "may need more technology development than planned for in their proposed schedule." *Id.* In short, the SEB found a *scheduling* risk, rather than a *technical* risk, with some of the TRLs in Ball's proposal. The SEB then reasonably assessed a *scheduling* weakness in the management approach subfactor.

The Court will not disturb the Agency's conclusion. Again, the "evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations." *Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384, 395 (2005). As previously held by this court, challenges to "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss*, 77 F.3d at 449. The Agency provided a "rational basis" for assigning Ball a scheduling weakness and this Court will not upset that determination. *See Savantage Fin. Servs.*, 595 F.3d at 1286.

> c. *The Agency reasonably exercised its discretion in assigning a weakness to Ball's proposal under the Technical Approach Subfactor.*

L3Harris alleges a third and final prejudicial error in the Agency's evaluation of Ball's Technical Approach subfactor.  Pl.'s Mot. at 14.  During its review of Ball's proposal, the Agency concluded that Ball provided insufficient information on both the "compliance with the GXS Pixel Operability requirements" and "on implementation of spectral performance requirements."  AR 5532–35.  The Agency assigned a "weakness" to both these components.  *Id.*  L3Harris maintains the Agency erred and should have assigned these components as deficiencies.  Had the Agency properly rated these two components, L3Harris argues, Ball's proposal would have received a lower overall rating.  *See* Pl.'s Mot. at 16 ("Ball's failure to provide the information necessary for the Agency to assess its compliance with spectral performance and focal plane pixel operability requirements mandated the assignment of deficiencies for these aspects of Ball's proposal, which would have materially lowered Ball's rating from Very Good to Poor.").

It bears emphasizing that the Court of Federal Claims has long held that technical ratings fall within a category of "discretionary determinations of procurement officials that a court will not second guess."  *Scott Techs., Inc. v. United States*, 168 Fed. Cl. 705, 721 (2023) (quoting *E.W. Bliss*, 77 F.3d at 449).  Again, agency officials enjoy "broad discretion to weigh an offeror's strengths and weaknesses as [they] see[] fit."  *Tetra Tech, Inc. v. United States*, 137 Fed. Cl. 367, 386 (2017).  "Protestors cannot merely present the Court with the same information that was before the agency and hope for a different determination, for even if the Court possessed the technical expertise to offer its own judgment, the Court lacks the authority to do so, under its highly deferential standard of review."  *Scott Techs., Inc.*, 168 Fed. Cl. at 721 (internal quotations omitted).

L3Harris' argument fails for two reasons.  First, L3Harris relies heavily on a single case, *Sys. Dynamics Int'l, Inc. v. United States*, 167 Fed. Cl. 780 (2023), to support its position that the Agency should have assigned deficiencies rather than weaknesses.  But the instant facts are distinguishable from those in *System Dynamics*.  The *System Dynamics* court held that the agency erred by assigning significant weaknesses—instead of deficiencies—when the awardee failed to provide information required by the solicitation.  167 Fed. Cl. at 794.  But the solicitation at issue in *Systems Dynamics* contained additional language not present here.  That solicitation gave examples of what would constitute a deficiency adjectival rating: "Examples of deficiencies include . . . *omission of data required to assess compliance* with the requirement."  *Sys. Dynamics Int'l*, 167 Fed. Cl. at 785 (emphasis added).  Recognizing that contracting officers must "evaluate proposals and assign adjectival ratings in accordance with the Solicitation's terms," the court observed that agencies could not deviate from their own definitions and examples.  *Id.* at 794.  "If the Agency finds that an offeror has materially failed to meet a Government requirement, which includes an 'omission of data required to assess compliance with the requirement,' its exercise of judgment ends there, as the Solicitation's terms instruct it to assign a Deficiency."  *Id.* at 794–95.  Crucially, L3Harris fails to acknowledge that the definition of "Deficiency" here contains no such language regarding "the omission of data required to assess compliance with the requirement."  *See* AR 308.  The language simply tracks FAR 15.001.  *Id.*

Second, in accordance with FAR 15.001, the instant solicitation defined deficiencies as "a material failure of a proposal to meet a Government requirement or a combination of

significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level." *Id.* As for spectral performance, the SEB concluded that "because of the increased risk that the proposed design will not meet one or more spectral performance requirements, there is an increased probability that design modifications will need to use unplanned resources (schedule and/or funding) to satisfy spectral performance requirements, which increases the risk of unsuccessful contract performance." AR 5535. The SEB recognized the spectral performance risks associated with Ball's proposal, but importantly did not determine these shortcomings increase "the risk of unsuccessful contract performance *to an unacceptable level.*" AR 308 (emphasis added).

As for Pixel Operability Requirements, the SEB similarly recognized flaws in Ball's proposal: "[T]here is a risk that Ball will not meet the GXS operability requirements leading to degraded system performance. Risk of [focal plane assembly] development increases the risk of unsuccessful contract performance. The SEB considers this primarily a technical risk since Ball has allocated sufficient resources for [focal plane assembly] development." AR 5533. But again, the SEB determined the risk of unsuccessful contract performance was acceptable, and the SEB appropriately applied its discretion to assess that potential risk.

The Court will not second-guess the Agency's technical judgment when the Agency provided a reasonable basis for its conclusions. *See Samsara Inc. v. United States*, 169 Fed. Cl. 311, 327 (2024) (noting that plaintiff's "challenge to the [agency's] assessment of [awardee's] risk is unavailing because the number of risks and the agency's assessment of those risks are within the agency's discretion"); *McConnell Jones*, 128 Fed. Cl. at 230 ("[A]bsent a facial conflict between the adjectival ratings assigned and the narrative justifications the agency provided (or some other dramatic internal inconsistency), the Court must grant great deference to the decisions of agency experts as to whether a particular proposal's strengths and weaknesses support a 'very good' rather than 'satisfactory' rating, or an 'exceptional' rather than 'very good' rating.").

> 2. The Agency reasonably evaluated Ball's Management Approach (Mission Suitability Subfactor B).

L3Harris claims the "Agency minimized the problems in Ball's Management Approach by housing them under a single weakness when the shortcomings identified by the Agency warranted a significant weakness and multiple, separate weaknesses." Pl.'s Mot. at 16. L3Harris points to several instances in which the Agency identified specific scheduling risks with Ball's proposal. Pl.'s Mot. at 16–17 (citing AR 5537, 5539–40). Each of these risks, L3Harris maintains, "posed an individual, separate risk to schedule." Pl.'s Mot. at 17. Accordingly, by "failing to assign Ball a significant weakness or multiple weaknesses, the Agency inflated Ball's score under the Management Approach subfactor and arbitrarily minimized the difference between the two offerors." *Id.*

L3Harris cites no authority in arguing the Agency should have assigned Ball a "significant weakness or multiple weakness" rather than a single weakness. *See* Pl.'s Mot. at 16–18. Its argument "is essentially a quibble with the [Agency's] technical judgment—an area in which the Court holds a narrow scope of review." *Greystones Consulting Grp., LLC v. United States*, No. 23-1298, 2023 WL 8370095, at *7 (Fed. Cl. Dec. 4, 2023). As explained above, "protests involving 'the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second

14

guess.'" *IAP Worldwide Servs., Inc. v. United States*, 159 Fed. Cl. 265, 286 (2022) (quoting *E.W. Bliss*, 77 F.3d at 449).

Here, the SEB determined that by "proposing a schedule with non-credible aspects, there is a high likelihood that Ball will not be able to meet the proposed schedule milestones." AR 5540.  But the SEB also concluded "there is a high likelihood that Phase-B will need to be extended at least 9 months" and that "Ball's schedule has sufficient un-costed slack between the proposed" date of delivery and the need date*. Id.*  In short, the Agency recognized and understood the scheduling risk associated with Ball's proposal.  *See id.* ("Ball's proposed unrealistic schedule increases the risk of unsuccessful contract performance.").  In the end, the Agency reasonably considered the relevance and potential impact of scheduling risk, and determined it merited a single weakness rather than "significant weaknesses or multiple weaknesses."  *See* Pl.'s Mot. at 17.  Because the Court must "give the greatest deference possible" to the SEB's technical determinations, the Court will not second guess the SEB's assignment of a single weakness rating to Ball.  *McConnell Jones*, 128 Fed. Cl. at 230.  Thus, for these reasons, L3Harris fails on Count I.

## B.  Count II: The Agency Conducted a Rational Cost Realism Analysis.

L3Harris argues that NASA, in analyzing the offerors' proposed costs, "disregarded 'material facts' regarding Ball's proposed costs and failed to adjust them to reflect the likely cost of performance."  Pl.'s Mot. at 18.  L3Harris claims four categories in which NASA engaged in improper cost realism analysis.  *Id.* at 19.  First, it argues that NASA's labor hour and associated cost adjustments to Ball's proposal were arbitrary and capricious.  According to L3Harris, the "Agency's technical evaluation makes clear that the cost evaluators erred in limiting adjustments to Ball's proposal to account for only nine additional months of work"; the "Agency misanalysed and inadequately documented the impact of a nine-month extension on Ball's labor hours"; and the administrative record "contains no contemporaneous substantiation supporting the Agency's other adjustments to Ball's labor hours."  *Id.* at 19–24; *see also* Pl.'s Reply at 8–11.  L3Harris' argument, in short, is that NASA improperly calculated the 224,000 estimated additional labor hours required for Ball's proposal, and the nine month addition to Ball's proposed schedule was insufficient, leading to a lower estimated probable cost.  Pl.'s Mot. at 19–22.

L3Harris makes a second and related argument that it was impossible for NASA to "rationally analyze[] costs for realism" because Ball's proposal omitted any cost for spare parts, despite "the RFP's explicit statement that spare Flight Model parts were to be 'costed in the proposal.'"  Pl.'s Mot. at 24–25 (citing AR 286); *see also* Pl.'s Reply 14–16.  And third, L3Harris maintains NASA failed to adjust the costs to reflect the risks associated with Ball's "unrealistic assumption" about when the options for Flight Models 2 and 3 "would be exercised."  Pl.'s Mot. at 25–27.  Finally, L3Harris states that NASA's cost analysis was flawed because it "disregarded the IGCE [Independent Government Cost Estimate] as irrelevant."  Pl.'s Mot. at 27.  Plaintiff argues that "by rejecting the IGCE because it did not 'assume' the re-use of heritage components, the cost evaluators effectively treated as equivalent Ball's and L3Harris' proposed design maturity."  *Id.* at 27.  According to L3Harris, this was problematic because NASA found L3Harris' proposal was a "mature" proposal that reduced risk, while Ball's presented "higher development risk."  *Id.* (citing AR 5673–74).  For the reasons explained below, the Court is unpersuaded by each of these claims.

1. <u>NASA's labor hour and cost adjustments were reasonable.</u>

The Agency believed "Ball had proposed an aggressive schedule in its first year of performance" and "concluded that Ball was unlikely to hit its technological readiness milestones." Def.'s Mot. at 21–22 (citing AR 5623). To account for the possibility that Ball would be unable to meet its technology readiness levels on its proposed schedule, the Agency extended Ball's schedule by nine months, which the Agency calculated to be an upward adjustment of 224,000 labor-hours to Ball's proposal. AR 5567, 5537 (" . . . given Ball's unrealistic TRL assessment . . . and technology development schedule, at a minimum, [preliminary design review] would need to be moved by 9 months"); Def.'s Mot. at 22 ("NASA knew that Ball's subsystems presented a schedule risk."). In short, L3Harris believes the Agency's calculation of 224,000 hours is "based on flawed assumptions." Pl.'s Mot. at 19.

NASA, per FAR 15.404-1(d), was to independently review Ball's and L3Harris' proposals to assess "the *probable* cost of performance." FAR 15.404-1(d)(2) (emphasis added). NASA's analysis needed to reflect its "*best estimate* of the cost of any contract that is *most likely* to result from the offeror's proposal." FAR 15.404-1(d)(2)(i) (emphasis added). Cost realism analysis is not an exact science. *See A-T Sols., Inc. v. United States*, 122 Fed. Cl. 170, 180 (2015); *OMV Med. Inc. v. United States*, 219 F.3d 1337, 1344 (Fed. Cir. 2000) ("It is unnecessary for an agency to demonstrate that a required cost realism analysis was conducted with 'impeccable rigor.'").

It is also well established that "contracting agencies have broad discretion regarding the nature and extent of a cost realism analysis." *Mission1st Grp.*, 144 Fed. Cl. at 211 (cleaned up). Indeed, the "court's scope of review of an agency's cost realism determination is very narrow." *McConnell Jones*, 128 Fed. Cl. at 236. In evaluating proposals, if an agency demonstrates it has "considered the information available" and did not "make irrational assumptions or critical miscalculations," the court should not infringe on the agency's discretion. *Dellew Corp. v. United States*, 128 Fed. Cl. 187, 194 (2016). Adjustments to an offeror's costs to reflect probable costs "is a highly technical endeavor." *CGS Adm'rs, LLC v. United States*, 110 Fed. Cl. 431, 458 (2013). Therefore, as "long as there is a rational explanation in the contemporaneous record for the cost adjustments performed by [NASA], the [C]ourt will not second-guess the agency's highly technical cost adjustment decisions." *Id.*; *see also Electro-Methods, Inc. v. United States*, 7 Cl. Ct. 755, 762 (1985) (stating that when an agency's decisions are highly technical, "judicial restraint is appropriate and proper").

L3Harris argues the labor-hour upward adjustment was flawed because it "did not account for at least five other 'critical subsystems' whose technology readiness Ball had mischaracterized as being at or above TRL 6." Pl.'s Mot. at 19 (emphasis omitted). Moreover, L3Harris claims there is no rational basis for NASA's decision to adjust the labor hours by "only 224,000 hours." *Id.* at 20. This argument is like the one made by the protestor in *CGS Administrators*. 110 Fed. Cl. at 461. The court there found that despite CGS's complaints that the "adjustments for . . . costs are not adequately explained," the record was "sufficiently clear to show the rationality of the agency's decision." *Id.* Such is the result here.

The record shows the agency considered that Ball's proposal was aggressive, upwardly adjusted Ball's labor hours to account for its ambitious schedule, and that 224,000 was not an arbitrary conclusion. *See* AR 5567 (noting the additional nine months needed for Ball's proposal which translated to 224,000 labor hours), 5623 (describing breakdown of the additional hours to

Ball's proposal), 11000 (handwritten notes pertaining to labor-hour adjustment).  Furthermore, both the Government and Defendant-Intervenor describe how the Agency reached its conclusions with cites to the record.  Def.'s Mot. at 24–25; Intervenor's Mot. at 23–26; Intervenor's Reply at 9–10.  While the Agency's calculation may not be perfect, it is a technical process, *CGS Adm'rs*, 110 Fed. Cl. at 461, and this Court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Id.* (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); *see also A-T Sols.*, 122 Fed. Cl. at 180 ("As cost realism determinations are within an agency's 'sound discretion and expertise,' the Court will not overturn a cost realism determination unless the plaintiff demonstrates the absence of a rational basis for the agency's decision.") (internal quotations omitted).

Additionally, L3Harris claims NASA erred by failing to adequately document more labor adjustments to Ball's proposal.  Pl.'s Mot. at 24 (citing AR 5567).  Again, L3Harris' argument falls flat.  L3Harris relies on *CW Gov't Travel, Inc. v. United States*, 154 Fed. Cl. 721, 740 (2021) for support.  However, that case addresses *price realism* analysis, not *cost realism* analysis.  *Id.*  "A 'price realism analysis,' a term not employed in the FAR, examines the performance risk of proposals in a fixed-price contract procurement, with particular attention to the risk of low-priced proposals, and may include the cost realism analysis referenced in FAR 15.404–1(d)."  *DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 663 (2010).  This is not a fixed-price contract.  Additionally, as in *CGS Administrators*, "the record is sufficiently clear" to show a rational decision.  *CGS Adm'rs*, 110 Fed. Cl. at 461; AR 5567–68, 5623.

### 2.  NASA's spare parts cost-analysis was reasonable.

L3Harris asserts that Ball's proposal omitted a calculation for spare parts, despite "the RFP's explicit statement that spare Flight Model parts were to be 'costed in the proposal.'"  Pl.'s Mot. at 24–25.  Particularly, L3Harris claims that because "not a single [basis of estimate] in Ball's Cost volume identified costs for spare parts," the Agency "could not have rationally analyzed those costs for realism."  *Id.* at 25.  Again, the Court is not persuaded.

To overturn an agency's cost realism determination, a plaintiff must establish that NASA's decision lacked a rational basis.  *See OMV Med.*, 219 F.3d at 1344; *McConnell Jones*, 128 Fed. Cl. at 236.  While an agency's cost realism analysis "need not have been performed with 'impeccable rigor'" to be rational, the analysis must reflect that the "agency considered the information available and did not make irrational assumptions or critical miscalculations."  *Westech Int'l, Inc. v. United States*, 79 Fed. Cl. 272, 286 (2007) (internal quotations omitted).

L3Harris' argument fails.  The record shows that Ball *did* include information about spares in its proposal:

> Ball has identified a cost-effective Sparing Plan of critical flight spares (Table A-29) to mitigate schedule and technical risk for each subsystem.  All spares for the program will be procured with [***] procurements.  In addition, the Focal Plane Assembly Flight Articles will procure [***] and [***].  Critical [***] will be procured per Ball [***], adjusted per GXS program specific requirements.

AR 1278, 1279 (Table A-29 includes an itemized list of spares, the description, Ball's make/buy decision for each, and the level of assembly of the spares).  *Contra* Pl.'s Mot. at 25 ("the Agency did not know what Ball proposed for spares").

Furthermore, L3Harris improperly reads the RFP as requiring the spare parts analysis to be considered in the Cost Volume. *Id.* at 24–25. But the RFP provision in question, as noted by Defendant-Intervenor, is contained in Section L (instructions to offerors), not Section M (proposal evaluation criteria). *See* Intervenor's Mot. at 28. Thus, L3Harris reads the RFP's purported "requirement" out of context. *Id.*; *see* AR 286, RFP § L.13, A.5 ("The Offeror shall discuss how the spares program, as costed in the proposal, will mitigate risk. Provide an itemized list of spares. Indicate whether spares are fabricated or purchased. The Offeror shall describe the level of assembly of spares."). L3Harris' argument is also flawed because it imputes this "requirement" within the Cost Volume when the cited provision is contained within the Mission Suitability Volume. AR 280. Taken in its full context, the "reasonable reading of this provision requires offerors to discuss their spares program in the context of their Mission Suitability proposals." Intervenor's Mot. at 29.

Notwithstanding L3Harris' flawed reading, the Court disagrees that the spare parts cost analysis conducted by NASA was unreasonable. And because this was a best-value procurement, the Court's consideration of NASA's decision is particularly deferential. *Westech*, 79 Fed. Cl. at 286; *Galen Med. Assocs*, 369 F.3d at 1330. Ball's plan for spares was sufficiently detailed within the record. *See* AR 1278–79. Without any identified issues with Ball's proposed spares program, the Agency was not required to make any adjustment to proposed costs. In other words, there is little evidence to support the notion that the Agency's finding was "irrational" or "miscalculated." *Dellew*, 128 Fed. Cl. at 194. Indeed, other than a mischaracterization of the RFP, L3Harris does not identify specific instances of Ball's spares program decision that the Agency irrationally evaluated. In short, NASA evaluated Ball's costs and found them to be adequate. *See* AR 1278–79; *OMV Med.*, 219 F.3d at 1344. The Court will not disturb those conclusions.

Finally, to the extent L3Harris implies that NASA's decision not to adjust Ball's proposed costs to account for spare parts amounts to unequal treatment, this argument also fails. "To demonstrate unequal treatment, a protestor must show that the federal agency treated similar defects in proposals differently." *ManTech Advanced Sys. Int'l, Inc. v. United States*, 141 Fed. Cl. 493, 510 (2019). As discussed below, NASA treated Ball's and L3Harris' spare parts plans differently because they were different proposals. *See infra* Section IV.C (discussing L3Harris' claim that the Agency engaged in unequal treatment in addressing the offeror's proposed costs for spare parts).

### 3. NASA's analysis of Ball's exercise options was reasonable.

L3Harris argues the Agency failed to consider Ball's "errant assumptions" for the early exercise of options. Pl.'s Mot. at 25. The RFP described exercise options to the offerors. AR 179 ("This competitive acquisition will result in . . . two (2) options for the build of FM2 and FM3 and four options for additional value to perform Engineering Studies, valued at $2M per option."). L3Harris maintains that because "Ball made an unrealistic assumption about when these options would be exercised," the Agency "did not know the dollar magnitude of the risk" and errantly "downplayed the added cost as 'minimal.'" Pl.'s Mot. at 25–26; AR 5539–40 (noting Ball's "unrealistic options schedule" and that it "is not possible to discern which case is costed by the level of detail in Volume III"). If the Agency had "rationally analyzed Ball's proposed costs to account for the impact of Ball's . . . errant assumptions concerning the exercise of options," the Agency would have upwardly adjusted Ball's estimated costs. Pl.'s Mot. at 26–27.

NASA did not upwardly adjust Ball's estimated costs for exercising options because it determined the "potential estimated value of this risk is minimal." AR 5569.  NASA also did not adjust Ball's proposal because "without proper material inflation factors, it is difficult to accurately quantify an actual cost associated with this risk."  *Id.*  In other words, NASA assumed the cost risk without "pinpointing the time of option exercise" because the risk was minimal. Def.'s Mot. at 29; *see also* Def.'s Reply at 11.  The record shows the Agency considered the potential cost impact of Ball's inability to buy options material in advance.  *See* AR 5569.

In determining whether an agency's action has a reasonable basis, the Court cannot substitute its judgment for that of the agency.  *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989).  Thus, the Court's function is limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'"  *Impresa*, 238 F.3d at 1332–33 (quoting *Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)).  And, as here, where "the solicitation does not set forth a particular methodology for the cost realism analysis, the agency enjoys broad discretion in conducting it."  *McConnell Jones*, 128 Fed. Cl. at 236 (cleaned up).  Thus, "the court's scope of review of an agency's cost realism determination is very narrow."  *Id.*

L3Harris essentially argues the Agency acted irrationally by failing to adjust the cost proposal based on unknown assumptions by an offeror. Pl.'s Mot. at 26.  But its position lacks merit for two reasons.  First, as noted by Defendant-Intervenor, "L3Harris does not attempt to quantify the impact of either the potential material escalation or the potential additional labor hours.  This is likely because both are highly speculative and cannot be estimated with any reasonable degree of accuracy—realities that only serve to support the Agency's conclusion." Intervenor's Mot. at 33; *see also* Intervenor's Reply at 14.  Second, NASA's determination that the cost proposal's difference would be *de minimis* is acceptable, as the Court may not "substitute its judgment" for what is NASA's reasonable conclusion.  *Turner Const.*, 645 F.3d at 1383; *see also Honeywell*, 870 F.2d at 648.  The SEB conducted a cost realism analysis, explaining the increases associated with Ball's proposal and why the risk associated with exercise of options was minimal.  AR 5569.  Aside from quibbling with the Agency's determination of low risk, L3Harris does not meaningfully challenge the Agency's conclusion. Indeed, L3Harris fails to cite a single authority for this argument.  Thus, there is no basis for the Court to supplant the Agency's finding.

Finally, L3Harris does not demonstrate prejudicial error on this issue.  The costs associated with Ball's exercise of options, as estimated by the Government, amount to $25.6 million.  Def.'s Mot. at 30.  This estimated possible increase to Ball's proposal is still $211 million below L3Harris' probable cost.  To prevail on this issue, L3Harris must show "there is a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process."  *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003).  Given the $211 million gap in costs, it is unlikely a less than five percent increase to Ball's proposed costs would have changed the outcome of this award.  *See* Def.'s Mot. at 30; *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996) ("A protester must show not simply *a significant error* in the procurement process, but also that *the error was prejudicial*, if it is to prevail in a bid protest.") (emphasis added).

19

        4.  <u>NASA's consideration of the Independent Government Cost Estimate was</u>
<u>reasonable.</u>

Ball's proposed cost was $486,863,957, while L3Harris' was $764,912,447.  AR 5620;
5629–30.  The Agency upwardly adjusted both proposals:

|  | **Ball** | **L3Harris** |
|---|---|---|
| **Proposed Cost** | $486,863,957 | $764,912,447 |
| **Total Probable Cost** | $553,897,346 | $790,953,918 |

The Independent Government Cost Estimate ("IGCE") calculated the estimated value of
the contract to be $1,169,168,029.  AR 7.  L3Harris argues NASA improperly ignored the IGCE
by failing to sufficiently examine the difference between Ball's proposed costs and the IGCE.
Pl.'s Mot. at 27.  Particularly, L3Harris asserts that Ball's proposed costs fell far below the
IGCE, and "effectively treated as equivalent Ball's and L3Harris' proposed design maturity and
use of heritage hardware, even though [NASA] explicitly found that L3Harris'" design was a
much lower development risk.  Pl.'s Mot. at 27.  In effect, L3Harris claims NASA disregarded
the IGCE, which caused the Agency to overlook important "red flags."  Pl.'s Mot. at 27–29;
Intervenor's Mot. at 33.  And by "ignoring the IGCE, the Agency effectively treated it as lacking
fidelity," L3Harris asserts.  Pl.'s Mot. at 29.

Again, this argument fails.  The record establishes NASA considered the IGCE during its
cost realism evaluation.  In the cost report, the SEB discussed the IGCE and explained why it
was higher than the offerors' proposed costs:

> An Independent Government Cost Estimate (IGCE) in the amount of
> $1,169,168,029 was established to support the requirements which includes a
> $688,266,783 Base Contract Period (FM1 and parts for FM2), $229,240,832
> Option Period 1 (FM2) and, $251,660,414 Option Period 2 (FM Spare).  The SEB
> team recognizes the IGCE was higher than both vendor's proposals.  The following
> reasons address the IGCE differences: (1) The IGCE did not assume any specific
> reuse for any previous design or hardware that both vendors proposed which led to
> a significant difference between the proposals and the Non-Recurring Engineering
> from the IGCE; (2) variances due to the indirect/direct rates and labor skill mix; (3)
> variances in fee percentage; (4) variances in the material amounts and; (5) variances
> in the proposed FM delivery schedule.

AR 5620.

As noted by Defendant-Intervenor, L3Harris fails to "identify a requirement—either in
the RFP or in procurement law—that the Agency conduct a line-by-line comparison of offerors'
cost proposals to the IGCE."  Intervenor's Mot. at 33.  This Court similarly cannot find such a
requirement.  In fact, the sole authority L3Harris relies on for its argument, *CW Gov't Travel*,
154 Fed. Cl. at 743, involved price reasonableness for a firm-fixed price task order.  *See*
Intervenor's Reply at 15.  Again, price reasonableness is different from a cost realism analysis.
*See DMS All-Star Joint Venture*, 90 Fed. Cl. at 663.  While the Court need not reach whether
each basis the Agency identified has "impeccable rigor," it is clear from the record that NASA
followed and compared Ball's proposal to the IGCE.  *OMV Med.*, 219 F.3d at 1344; AR 5620;
*see also Harmonia Holdings Grp., LLC v. United States*, 136 Fed. Cl. 298, 307 (2018) ("It is
within the exercise of [the agency's] sound discretion to determine its realism methodology, and

comparing prices to the IGCE is one rational approach."). *Cf. Preferred Sys. Sols., Inc. v. United States*, 110 Fed. Cl. 48, 61 (2013) (in the context of a price realism analysis, finding the agency's decision was not arbitrary, capricious, or an abuse of discretion where the bid was 60% lower than the IGCE). It is similarly significant that L3Harris' proposed costs were also much lower than the IGCE. The argument that the Agency failed to sufficiently scrutinize the gap between proposed costs and the IGCE also apply to L3Harris' proposal, suggesting the Agency may have "overlooked important red flags" with L3Harris' proposal as well. *See* Pl.'s Mot. at 27–29. In other words, "L3Harris is playing with a double-edged sword." Intervenor's Mot. at 34. In short, L3Harris' mere disagreement with the extent to which the Agency relied on the IGCE is not grounds for relief.

### C. Count III: The Agency Did Not Engage in Unequal Treatment.

Plaintiff argues the "Agency engaged in unequal treatment with respect to its handling of L3Harris' and Ball's proposed costs for spare parts." Pl.'s Mot. at 29. L3Harris claims the "Agency imposed a significant upward adjustment" to L3Harris' proposed costs but the Agency "made no such adjustments to Ball's proposed cost." *Id.*; *see* AR 5621, 5629 (upwardly adjusting L3Harris' material costs by roughly $25 million). In Plaintiff's words, "the Agency gave Ball a free pass regarding spare parts costs while decrementing L3Harris." Pl.'s Mot. at 29. Such conduct, L3Harris maintains, "'goes against the standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process and amounts to an abuse of the agency's discretion.'" *Id.* at 30 (quoting *CliniComp Int'l*, 117 Fed. Cl. at 741 (internal quotation omitted)).

The Court is unpersuaded. A "contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." *Banknote Corp.*, 56 Fed. Cl. at 383. Indeed, FAR 1.602-2(b) requires contracting officers to give "impartial, fair, and equitable treatment" to all government contractors. "Equal treatment, however, does not require that all proposals be treated the same." *Chenega Mgmt., LLC. v. United States*, 96 Fed. Cl. 556, 585 (2010); *see also* FAR 1.102-2(c)(3) ("All contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same."). The Federal Circuit has held that to demonstrate unequal treatment, "a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical [to] those contained in other proposals" or that "the agency inconsistently applied objective solicitation requirements between it and other offerors." *Off. Design Grp.*, 951 F.3d at 1372. "[H]aving the Court pass judgment regarding the relative merits of proposals that are not substantively indistinguishable 'would give a court free reign to second-guess the agency's discretionary determinations underlying its technical ratings' and '[t]his is not the court's role.'" *Tech. Innovation All. LLC v. United States*, 149 Fed. Cl. 105, 132 (2020) (quoting *Off. Design Grp.*, 951 F.3d at 1373).

L3Harris has not shown its spares program was "substantively indistinguishable" from Ball's. In fact, L3Harris makes no showing the proposals were even similar. Pl.'s Mot. at 29–30; Pl.'s Reply at 18–19; Def.'s Mot. at 28 ("NASA treated Ball's and L3Harris' spare parts plans differently because they were substantially different."); Intervenor's Mot. at 37 ("In its evaluation, the Agency treated the proposals differently because the proposals are—different."); Intervenor's Reply at 16. The Court agrees that the spare parts programs were different. Ball proposed purchasing spares with flight units. AR 10498. L3Harris, on the other hand, proposed a rolling wave spare plan. AR 10500 (a rolling wave spare plan means there will be no spares

"when the last unit is being built"). Accordingly, the spares programs were distinct, and the Court will not reweigh "the relative merits of proposals that are not substantively indistinguishable." *Tech. Innovation All.*, 149 Fed. Cl. at 132.

Even if this Court concluded the Agency engaged in unequal treatment, to prevail, L3Harris "must show that this instance of unequal treatment was prejudicial." *Off. Design Grp.*, 951 F.3d at 1373. In other words, L3Harris must show that but for the alleged unequal treatment of L3Harris' and Ball's spare parts programs, L3Harris had a substantial chance to receive the contract award. *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999). L3Harris makes no such showing. Accordingly, the Court denies L3Harris relief on Count III.

### D. Count IV: The Agency's Evaluation was Adequately Documented.

L3Harris argues the SEB presentation relied on "summaries," or "wholly undocumented conclusory assertions." Pl.'s Mot. at 30. The Administrative Record, according to L3Harris, lacks any technical evaluation report. *Id.* Additionally, L3Harris argues the only underlying analysis is the Cost Report, which is "riddled with conclusory assumptions and determinations for which no support was provided." *Id.* L3Harris asserts that neither the "SEB presentation nor any other document" in the Administrative Record adequately explains or documents the Agency's decision about several enumerated items. *Id.* at 30–31 (listing decisions from the Agency purportedly lacking in sufficient documentation). L3Harris thus concludes that because of the alleged unsupported findings, NASA lacked a rational basis for its decision, and the protest "must be sustained." Pl.'s Mot. at 31 (citing *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 370 (2009)); *see also* Pl.'s Reply at 19–20.

This line of argument is largely a repackaging of L3Harris' previous points regarding assessments of Ball's technical approach and the Agency's upward adjustments to Ball's schedule and proposed costs. *Compare* Pl.'s Mot. at 24 *with* Pl.'s Mot. at 31. The Administrative Record spans over 10,000 pages, and the Court agrees with Defendant-Intervenor that by "setting forth a list of purported documentary deficiencies without accompanying explanations," L3Harris is "effectively inviting the Court to search through the record and do plaintiff's work for them." Intervenor's Mot. at 40. That said, the SEB presentation, spanning over one hundred slides, details the findings related to adjectival ratings for both offerors, the rationale for the strengths and weaknesses assigned, the cost evaluation approach and why the costs were adjusted. AR 5511–5616. Moreover, the source selection statement—which spanned ten pages of explanation and analysis—clarified the evaluation procedures, addressed the strengths and weaknesses of each proposal, why L3Harris' proposal was rated only slightly higher than Ball's, the cost evaluation for both offerors, and why Ball's proposal was the most advantageous to the Government. AR 5667–76; *see also* Def.'s Reply at 12–13.

It is clear to the Court that the Agency documented its source selection decision in accordance with the applicable regulation. *See* FAR 15.308 ("The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs. Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision."); *see also Blackwater Lodge & Training Ctr., Inc. v. United States*, 86 Fed. Cl. 488, 514 (2009) ("An agency demonstrates proper exercise of

discretion so long as it documents its final award decision and includes the rationale for any business judgments and tradeoffs made.").  As a result, L3Harris fails on Count IV.

### E.  Count V: NASA did not Create an Unmitigated Appearance of Impropriety.

L3Harris believes the circumstances leading up to [***] appointment to serve as GSFC's new director "give rise to palpable appearance of impropriety concerns."  Pl.'s Mot. at 31. L3Harris offers a journalistic allusion: "Any newspaper reader would readily grasp the import of the headline: 'Government hires former company VP in charge of satellite business shortly before awarding huge satellite contract to same company.'"  *Id.* at 33.  According to L3Harris, the evaluation of Ball's proposal "was made by persons who reported either directly or up the management chain to [***]."  *Id.* at 32–33.  L3Harris states that the "Agency treated [***] appointment as a non-issue and cavalierly pushed ahead without investigating, appropriately mitigating, or documenting the potential impact on the procurement."  *Id.* at 35.  But the facts tell a different story.

First, a brief background.  The record shows that [***] started her career at Ball in 2013. AR 7365 ¶ 6.  From 2018 until September 16, 2022, she served as Vice President and General Manager for Civil Space where she was "responsible for all new business execution and financials and the development of the workforce."  AR 7365 ¶ 6.  She subsequently left Ball and started a consulting business where she worked until accepting a job with NASA.  *Id.*  [***] was "tentatively selected as the NASA-GSFC Center Director on February 2, 2023," "accepted the position on March 12, 2023," and "officially entered into civil service on April 6, 2023."  AR 7364 ¶ 3.  As the GSFC Center Director, [***] responsibilities include managing the annual budget, building and maintaining relationships with industry, leading multi-disciplinary teams in critical Agency capabilities, developing innovative solutions and strategic direction that further the Agency mission, and providing recommendations and decisions on Agency governance councils.  AR 7364–65 ¶ 4.  Importantly, [***] "duties do not include direct or substantial involvement in the process of acquiring goods or services," and she has "no direct or substantial responsibility for the evaluation or award of any contracts."  AR 7365 ¶ 5.

While employed at Ball, [***] did not have direct supervision over the GeoXO program. AR 7365 ¶ 7.  And before starting work at GSFC, the record shows [***] took measures to mitigate any appearance of impropriety with her former employer.  [***] divested all Ball assets she owned and rolled them over into mutual funds.  AR 7365 ¶ 8.  She also converted all deferred compensation into an index fund so "that when the deferred compensation paid out in cash the payout would be based on the index fund's performance, not on Ball Corp.'s performance."  AR 7365 ¶ 9.  Additionally, as part of the vetting process, [***] met with Agency ethics officials to discuss her prospective employment.  AR 7366 ¶ 10.  To ensure compliance with applicable regulations, [***] "refrained from participating in any matter in which Ball was involved."  AR 7366 ¶ 9.  Significantly, GSFC's "Deputy Center Director, Associate Center Director, and the Office of the General Counsel all knew of [her] need to avoid any NASA matters with Ball Aerospace and ensured that [she] did not take part in any matters, including" the procurement giving rise to this protest.  AR 7366 ¶ 11, 7367 ¶ 7 ([***] and the SSA both declaring, under penalty of perjury, that [***] was not consulted and "was firewalled away from this procurement").  Accordingly, [***] was not involved in any activities related to Ball, "including those activities related to the GeoXO Program and more specifically the procurement for the GeoXO Sounder."  AR 7366 ¶ 11.  In fact, [***] declared, under penalty of perjury, that

she "only learned of Ball Aerospace's winning the GeoXO Sounder contract after it was reported in the news." *Id.*

The record shows [***] met with ethics officials and understood she was prohibited from working on any matters involving her former employer. *See* AR 7365–67. Moreover, the "firewall" between [***] and Ball was communicated to agency officials involved in the procurement process. AR 7367. The fact that the SSA "did not consult or talk to [***] regarding this procurement," *id.* ¶ 7, must be given weight because of his "considerable discretion in determining whether a conflict is significant." *PAI*, 614 F.3d at 1352. In short, L3Harris presents no "hard facts" of impropriety. Combined with NASA's meaningful evaluation, the Agency walling off [***] from this procurement, and broad agency awareness that [***] was precluded from working on any matters involving Ball, the Court finds there was not even an appearance of impropriety.

The facts here are particularly novel, L3Harris suggests, and therefore no precedent is binding on this issue. Pl.'s Mot. at 33 ("Admittedly, this protest presents a distinct appearance of impropriety concern with which it does not appear this Court has had occasion to grapple."). To overcome the lack of authority supporting its argument, L3Harris states that "'whether a potential conflict may exist depends on the particular facts and circumstances of the contract being performed and on the nature of the new procurement.'" *Id.* (quoting *Jacobs Tech. Inc. v. United States*, 100 Fed. Cl. 198, 210 (2011)). NASA, therefore, was required to take "adequate steps to protect against even the mere appearance of impropriety" which it failed to do. *Id.* at 33 (citing *Oak Grove Techs., LLC v. United States*, 155 Fed. Cl. 84, 115 (2021)).

L3Harris asserts that NASA failed to "draft any firewall memoranda for distribution" and neglected to ensure "all procurement officials understood the restrictions the law placed on them and [***]." *Id.* Rather than memorialize the situation in writing, L3Harris believes that NASA relied on mere "water cooler talk" to inform employees that [***] could not be involved with Ball matters. *Id.* at 34. L3Harris cites *Point Blank Enterprises, Inc. v. United States*, 168 Fed. Cl. 676, 685 (2023), for the argument that "integrity concerns . . . 'worthy of consideration'" must be investigated by the Contracting Officer. *Id.* at 34. Finally, L3Harris argues that NASA's onboarding process with [***] alongside the agency contract award was inappropriate, as alternatives were available. *Id.* at 35. Namely, selection responsibility could have been transferred to another NASA Center, or "at a minimum . . . prepared a robust firewall memorandum and ensured receipt and acknowledgement by all affected procurement officials." *Id.*

Even so, the mere existence of a prior or current contractual relationship between a contracting agency and a firm does not create an unfair competitive advantage. *PAI Corp.*, 614 F.3d at 1353. Moreover, the identification of an actual Organizational Conflict of Interest ("OCI") must be based on "hard facts; a mere inference or suspicion of an actual or apparent conflict is not enough." *Turner Constr.*, 645 F.3d at 1387. An allegation of OCI relying on "suspicion and innuendo" fails when no facts point to any impropriety. *C.A.C.I.*, 719 F.2d at 1582. To show impaired objectivity OCI, there must be hard facts showing that "'a government contractor's work under one government contract could entail it evaluating itself . . . through . . . an evaluation of proposals.'" *Sigmatech Inc. v. United States*, 144 Fed. Cl. 159, 181 (2019) (quoting *Aegis Techs. Grp., Inc. v. United States*, 129 Fed. Cl. 561, 575 (2016) (cleaned up)). Thus, agencies must not award a contract to an offeror with an impaired objectivity OCI "without proper safeguards to ensure objectivity to protect the Government's interests" in the

procurement process. *Paradyme Mgmt., Inc. v. United States*, 167 Fed. Cl. 180, 186 (2023) (citing FAR 9.505-3); *see also C.A.C.I.*, 719 F.2d at 1571 (holding that out of an agency's Evaluation Committee's five members, four of whom had worked for an offeror in the bid contest, was not an improper evaluation because there was no negotiation for employment during the bid process).

L3Harris fails to show the requisite "hard facts" to sustain a claim of agency impropriety. *Turner Constr.*, 645 F.3d at 1387. The Court of Federal Claims has held that a bid protest predicated on impropriety faces an uphill battle because the "hard facts" standard requires more than just speculation. *Turner Constr.*, 645 F.3d at 1387; *Paradyme Mgmt.*, 167 Fed. Cl. at 186; *Harmonia Holdings Grp., LLC v. United States*, 144 Fed. Cl. 726, 734 (2019). To illustrate, the facts here are distinguishable from those in *Trace Systems v. United States*, 165 Fed. Cl. 44 (2023), a case in which the protestor demonstrated "hard facts" of impropriety. In *Trace Systems*, the court found "hard facts" of impropriety because the Contracting Officer "identified specific information that [claimant] possessed and explained why that information was non-public and competitively useful . . . " *Id.* Here, L3Harris' arguments amount to mere speculation. *See Paradyme Mgmt.*, 167 Fed. Cl. at 189; *Turner Constr.*, 645 F.3d at 1387. It presents no facts suggesting that [***] participated in the evaluation and contract award, let alone that she played an influential role in tipping the scale in Ball's favor. Pl.'s Mot. at 32–33; *see also* Intervenor's Reply at 19 ("L3Harris does not dispute [***] . . . sworn statements that she did not participate in or have any involvement with the GXS procurement."). Instead, L3Harris claims the "evaluation . . . was made by persons who reported either directly or up the management chain to [***]," insinuating "evil motive" without any supporting facts. *Id.*; *C.A.C.I.*, 719 F.2d at 1582. Thus, L3Harris' conclusory statements that there are "hard facts show[ing] even the mere appearance of impropriety" is unpersuasive. Pl.'s Mot. at 35.

True, the "general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships." FAR 3.101-1. And as the court stated previously, "hard facts do not need to show an actual conflict—a potential conflict can be sufficient." *Trace Sys.*, 165 Fed. Cl. at 58 (internal citations omitted). That said, there is "a distinction between circumstances where 'hard facts' indicate the existence or potential existence of impropriety and circumstances . . . where the finding of an OCI relies on inferences based upon suspicion and innuendo." *Turner Const.*, 645 F.3d at 1387 (internal citations omitted). But there are simply no "hard facts" here showing an actual conflict or a potential conflict. *See* Def.'s Reply at 15 ("These allegations evince nothing indicating that NASA might have acted without 'complete impartiality and with preferential treatment for none' or . . . that there was 'any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships.'" (citing FAR 3.101-1)).

L3Harris believes NASA should have memorialized [***] "firewall" in writing. Pl.'s Mot. at 35. But the Federal Circuit has explained that the "identification of OCIs . . . require[s] the exercise of considerable discretion on the part of the agency." *Turner Constr.*, 645 F.3d at 1384. Thus, if the Court finds the Contracting Officer's decision "rational," then it should not be disturbed. *Id.* More importantly, a "contracting officer is not required to document in writing or submit for approval a plan to neutralize apparent or potential conflicts, which in her discretion and judgment she deemed not to be significant." *Paradyme Mgmt.*, 167 Fed. Cl. at 191 (internal quotations omitted); *see also PAI*, 614 F.3d at 1353 ("[B]ecause the contracting officer determined that no significant potential conflict existed, she was not required to submit a written

analysis . . .").  It was reasonable for the Contracting Officer to forgo a written analysis or memorialization in writing given all the documented steps both the Agency and [***] took to ameliorate any appearance of impropriety.  *See* Pl.'s Mot. at 35.

In short, L3Harris relies on allegations "that do not even rise to the level of suspicion and innuendo."  Def.'s Reply at 13; *see also C.A.C.I.*, 719 F.2d at 1582.  The record shows [***] was walled off from the procurement process, did not participate in any activities related to the GeoXO Program, and fully divested from Ball.  AR 7365–66.  Furthermore, employees and directors at the Agency were informed of the importance of keeping [***] firewalled from this procurement.  AR 7366.  For all these reasons, L3Harris' attempt to create a conflict fails.  L3Harris has not met the requisite showing of an appearance of impropriety, and its protest fails on Count V.

### F.  Count VI: L3Harris Is Not Entitled to Injunctive Relief.

To warrant permanent injunctive relief, a plaintiff must establish each of four factors:

(1)  whether, as it must, the plaintiff has succeeded on the merits of the case;

(2)  whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief;

(3)  whether the balance of hardships to the respective parties favors the grant of injunctive relief; and

(4)  whether it is in the public interest to grant injunctive relief.

*PGBA, L.L.C. v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004) (citations omitted).  Because L3Harris has not succeeded on the merits, the Court denies L3Harris' request for injunctive relief.

## V.  Conclusion

"Procurement officials have substantial discretion to determine which proposal represents the best value for the government."  *E.W. Bliss*, 77 F.3d at 449.  "An agency has the discretion to select a lower-priced, lower-technically-rated proposal if it decides that the higher price of a higher-technically-rated proposal is not justified, even if the solicitation emphasizes the importance of technical merit."  *Blackwater Lodge*, 86 Fed. Cl. at 514.  Such is the case here.  L3Harris may have offered a higher technically rated proposal.  But it was within the Agency's discretion to select Ball, which offered a substantially cheaper option.  After all, L3Harris' proposal was nearly 43% more expensive than Ball's.  *See* AR 5620–22, 5629–30.

For the foregoing reasons, Plaintiff's Motion for Judgment on the Administrative Record is **DENIED**.  Defendant's Cross-Motion for Judgment on the Administrative Record is **GRANTED**.  Intervenor's Cross-Motion for Judgment on the Administrative Record is similarly **GRANTED**.  The Court directs the Clerk of the Court to enter judgment accordingly.

**IT IS SO ORDERED.**

  s/ Carolyn N. Lerner
CAROLYN N. LERNER
Judge